REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1025

September Term, 2013

---

ALLSTATE LIEN & RECOVERY
CORPORATION, ET AL.

v.

CEDRIC STANSBURY

---

Zarnoch,
Graeff,
Hotten,

JJ.

---

Opinion by Graeff, J.

---

Filed: October 7, 2014

This case involves a garageman's lien, a lien created on a motor vehicle on behalf of someone who conducted work on a vehicle but was not paid for the service by the owner of the vehicle. Cedric Stansbury, appellee, brought suit in the Circuit Court for Baltimore County against appellants, Allstate Lien & Recovery Corporation ("Allstate"), Russel Auto Imports, LLC ("Russel"), and Jeremy Martin. He alleged that appellants violated Maryland's Consumer Protection Act ("MCPA"), Md. Code (2013) § 13-301, *et. seq.* of the Commercial Law Article ("CL"), and Consumer Debt Collection Act ("MCDCA"), CL § 14-201, *et. seq.*, by, among other things, including a "processing fee" of $1,000 as part of the amount of the lien that Mr. Stansbury was required to pay to redeem his vehicle. The circuit court ruled, as a matter of law, that the processing fee was not part of the garageman's lien. It instructed the jury of that ruling, and the jury subsequently found that appellants violated the MCPA and the MCDCA. It awarded Mr. Stansbury $16,500 in compensatory damages, plus attorney's fees.

On appeal, appellants present the following two questions for our review:

1. Did the circuit court err in finding that a processing fee is not part of a garageman's lien and cannot be included in the amount necessary to redeem the vehicle?

2. Does including the processing fee in the amount needed to redeem a vehicle violate the Maryland Debt Collection Act's prohibition against enforcing a "right" that does not exist?

For the reasons that follow, we shall affirm the judgment of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

Mr. Stansbury brought his vehicle to Russel's service department because the vehicle's engine had stopped running, and while it was stopped, it was hit by another vehicle. Mr. Martin, manager of Russel's car repair facility, testified that, in April 2011, he met with Mr. Stansbury, who signed a repair authorization form. Russel subsequently repaired Mr. Stansbury's vehicle. On May 9, 2011, someone left a message for Mr. Stansbury that the repairs were done. On May 16, 2011, Mr. Martin spoke with Mr. Stansbury and informed him that the repair work was complete. On May 17, 2011, he spoke with Mr. Stansbury again about picking up the car, and he advised that the total amount owed was $6,330.37. Mr. Stansbury requested a payment plan, but he was informed that the repair bill had to be paid in full. On May 21, 2011, Mr. Martin left a message for Mr. Stansbury informing him of the "deadline with the lien," meaning the date that Mr. Martin would start the lien process if Mr. Stansbury did not pick up his vehicle.

On June 2, 2011, fifteen days after Mr. Stansbury was made aware of the payment due to Russel, Mr. Martin met with Allstate to begin the process of selling Mr. Stansbury's vehicle. Mr. Martin, the representative of Russel, the lien holder, and Allstate executed a "Notice of Sale of Motor Vehicle to Satisfy a Lien" ("Lien Notice"). The Lien Notice sent to Mr. Stansbury provided that Allstate, on behalf of Russel, would sell Mr. Stansbury's vehicle at public auction to satisfy Russel's lien, unless Mr. Stansbury paid the following: repair charges in the amount of $6,630.37; and "Costs of Said Process," in the amount of

$1,000, for a total of $7,630.37. The Lien Notice provided that, unless Mr. Stansbury paid that amount in full within ten days of the Lien Notice, Allstate would sell the vehicle on June 23, 2011.

Mr. Martin agreed that the repair charges in the Lien Notice were $300 more than the total amount owed for repairs, but he stated that Allstate suggested that they include the additional amount for storage charges. Mr. Martin agreed that Mr. Stansbury did not consent in writing to storage charges for the vehicle, and the repair authorization form did not mention storage fees. The additional $1,000 was not related to repair or storage. Mr. Martin testified at his deposition that, once the documents were signed on June 2, 2011, he would not have allowed Mr. Stansbury to get his car back unless he paid $7,630.37, but at trial, he stated that he would have referred any questions pertaining to the car to Allstate.

Mr. Martin certified under oath to the Motor Vehicle Administration that the amount owed for repairs to Mr. Stansbury's vehicle was $6,630.37, even though the total included $300 for storage fees, and a box on the MVA form where storage fees should have been indicated was not checked.[1] Thus, the number reported to the MVA for repair costs was incorrect. Mr. Martin stated that he did not know "why the official certification that was submitted to the MVA states the lien amount at $6,630.37, but . . . Mr. Stansbury was told the lien amount was $7,630.37."

_____

[1] A check in the box would indicate "storage with owner written consent."

On June 23, 2011, Mr. Stansbury's vehicle was sold at auction for $7,730. Mr. Martin denied that the signature on the bill of sale submitted to the MVA was his, suggesting that the signature was forged.

John Ports, a representative of Allstate, testified during his deposition that Allstate assists automobile repair shops in collecting debts owed from vehicle repairs. Allstate does not "write a lien" to collect an unpaid debt until the lien holder has had the vehicle for thirty days. Although the actual costs incurred may vary from lien to lien, Allstate's standard "cost of process" for collecting debts is $1,000. The $1,000 charged to Mr. Stansbury, as with all other debtors, was "front-loaded" and becomes part of the lien. Mr. Ports agreed that Russel never incurred the $1,000 in costs. He also agreed that if Mr. Stansbury had attempted to retrieve his vehicle on June 3, he would have been required to pay $7,630.

At trial, Mr. Ports testified that Mr. Stansbury's vehicle sold at auction for $7,730, and Russel was entitled to $6,630, plus $522 that it paid to Allstate to process the lien. Mr. Stansbury was entitled to receive overage from the sale in the amount of $99.60, but that amount remained in escrow at the time of trial. Mr. Ports explained that Allstate adds $1,000 to the amount owed to a garage "as the minimum bid." After the vehicle is sold at auction, the funds are dispersed to the garage for the amount due to it for its bill, as well as the amount it paid to Allstate to recover the lien. The remainder is retained by Allstate, and split between the company and the sales representative. The "processing fee" includes payment for a title fee, advertising fees, the cost of a title search, and the cost of "paying the office

-4-

staff and keeping the lights on and things like that." Allstate recommended to Russel that it charge the $300 storage fee. As of June 2, 2011, when the $1,000 was included in the lien amount, the only actual cost incurred was $22 for a title search. Mr. Ports agreed that a contract to recover a lien should not be entered into until the vehicle has been held for a period of thirty days after the bill becomes due.

Mr. Stansbury testified that, in December 2010, he brought his vehicle to Russel for an oil change. Although his vehicle had been "running great before the oil change," a week after the oil change, it "ceased, cut off . . . right in the middle of the street during rush hour traffic," and he could not get it started again. As his car sat in the middle of the roadway, in the snow, another vehicle ran into the back of his car. Mr. Stansbury had his vehicle towed to Russel. A few days later, Russel advised Mr. Stansbury that he needed a new engine.

On May 18, 2011, Russel contacted Mr. Stansbury to inform him that his vehicle was ready to be picked up. The same day, at approximately 5:30 p.m., Mr. Stansbury went to Russel, and he was told that he owed $6,330.37. Mr. Stansbury began writing a check for that amount, but he was told that he would have to return the next day to talk to Mr. Martin because Russel did not accept personal checks. Mr. Stansbury did not have $6,330.37 in his checking account when he wrote the check, but he stated that he intended to immediately deposit the funds into the account after leaving Russel. The following day, Mr. Stansbury called Mr. Martin to tell him that he would try to get to Russel to pick up his vehicle, but by

the time he arrived after work, the shop was closed. He made three or four attempts to get to Russel before it closed, but he was unable to do so.

In the beginning of June, Mr. Stansbury received the Lien Notice stating that there was a lien on his vehicle in the amount of $7,630.37. He called Mr. Martin and asked him why there was a lien on his vehicle. Mr. Martin responded that Mr. Stansbury did not pay for the repairs "in time," and he would have to contact Allstate to ask them not to put the car up for auction. Mr. Stansbury attempted to call Allstate, but his calls were not answered.

During the week of June 8, Mr. Stansbury went to Allstate. The office manager, Josephine Keehner, was "nasty" and not "very agreeable or cooperative." She told him that his car would be put up for auction on June 23. Ms. Keehner repeatedly told Mr. Stansbury that the vehicle was not his, and that if he wanted it, he would have to bid on it at auction. Between June 8 and June 23, he repeatedly tried calling Allstate to get his vehicle back, but no one would answer or return his calls. At that point, Mr. Stansbury had $6,300 to recover his vehicle, he did not have $7,600.

With respect to the value of his vehicle at the time of auction, Mr. Stansbury believed that it was worth at least $25,000. Mr. Stansbury paid more than $31,000 for the vehicle, approximately two years prior to the time it was auctioned for sale.

At the close of the evidence, appellants moved for judgment. An extensive discussion ensued on the issue of "front-loading" "cost of process" and storage fees, i.e., whether it was permissible to require the owner to pay these fees to redeem his or her vehicle. Counsel for

-6-

Russel argued that the case presented two questions: (1) whether, as a matter of law, front loading of processing fees is permissible; and (2) if it was not permissible, does that constitute a violation of the MCDCA.[2] The court recessed, stating that it needed "to do some reading."

The following day, the court issued its ruling. Initially, it noted the "surprising lack of law on the topic." The court ultimately ruled that the garageman's lien statutes do not permit "front-loading" of processing fees. Although the statutes anticipate reimbursement of such fees, the fees are not permitted to be part of the initial lien. Accordingly, the court granted Mr. Stansbury's Motion for Partial Summary Judgment.

The court instructed the jury that it had made a decision as a matter of law and determined that "the $1,000 processing fee is not an appropriate part of the lien," and it "should not have been an upfront cost . . . added to the lien in advance."[3] It then advised that

---

[2] Counsel for Mr. Stansbury advised that she earlier had filed a Motion for Partial Summary Judgment, arguing that the front-loading of processing fees was not permitted by law, which the court denied on procedural grounds. Counsel then renewed her "motion for judgment on the grounds of the illegality of the front-loading fees."

[3] The Third Amended Complaint alleged various deceptive and/or misleading practices in violation of Maryland's Consumer Protection Act ("MCPA") and Consumer Debt Collection Act ("MCDCA"), including: the demand for "$1,000 in 'costs of process' before the car was sold, when this amount is not allowed under the mechanic's lien statutes"; the failure to return the difference between the sale price and the lien amount to Mr. Stansbury; and demanding storage fees before Mr. Stansbury could recover the car. Appellants did not request that the instructions to the jury or the verdict sheet address the alleged violations of the MCDCA and the MCPA based on front loading fees separate from other alleged violations of the Acts.

it would instruct on the law applicable to the case. Pertinent to this appeal, the court instructed the jury as follows:

> Unfair or deceptive trade practices include any false, falsely disparaging or misleading oral or written statement, visual description or other representation of any kind which has the capacity, tendency or an effect of deceiving or misleading consumers. Representation that consumer goods, consumer realty or consumer services has a sponsorship, approval, accessory, characteristic, ingredient or use, benefit or quantity which they do not have, failure to state a material fact if the failure deceives or tends to deceive, deception, fraud, false pretense, false premise, misrepresentation or knowing concealment suppression or omission of any material fact with intent that a consumer relies on the same in connection with the promotion or sale of any consumer goods, consumer realty or consumer service, violation of a provision of Title 14, Subtitle 2 of this article which is the Maryland Consumer Debt Collection Act.

> In collecting or attempting to collect an alleged debt, a collector may not claim, attempt or threaten to enforce a right with actual knowledge or reckless disregard that the right does not exist. In the event you find for the Plaintiff on the issue of liability, then you must go on to consider the question of damages. It would be your duty to determine what, if any, award would fairly compensate the Plaintiff for the losses.

The jury found that appellants violated the MCPA and the MCDCA. It awarded Mr. Stansbury damages in the amount of $16,500, plus attorney's fees.

## DISCUSSION

Appellants raise two arguments in this appeal. First, they contend that the circuit court erred in its interpretation of CL § 16-202, the garageman's lien statute. The issue presented is what is encompassed in the lien created when a person requests repairs to be done to a motor vehicle and then does not pay for those repairs. Appellants argue that the court erred in determining, and instructing the jury, that the $1,000 processing fee "was not an

-8-

appropriate part of the lien, that should not have been an upfront cost . . . added to the lien in advance."

Second, appellants argue that, "even if the processing fee should not have been included in the amount necessary to redeem the vehicle," the MCDCA's prohibition against enforcing a "right" that does not exist was not violated. They assert that they had the "right" to execute on the lien pursuant to the garageman's lien statute.

We will address both these arguments in turn.

**I.**

**Motor Vehicle Lien**

The first issue, the scope of a garageman's lien, involves an issue of statutory interpretation. That is a question of law, which we review *de novo*. *Martin v. Allegany Co. Bd. of Educ.*, 212 Md. App. 596, 611, *cert. denied*, 435 Md. 268 (2013).

It is well-settled in Maryland that "the goal of statutory interpretation is to 'ascertain and implement, to the extent possible, the legislative intent.'" *Rodriguez v. State*, ___ Md. App. ___, No. 743, Sept. Term, 2012, slip op. at 63 (filed Aug. 27, 2014) (quoting *Forster v. Public Defender*, 426 Md. 565, 579 (2012)). In doing so, we look first to the statute's plain language, "giving the words their natural and ordinary meaning." *Id.* "If the language is clear and unambiguous on its face, our inquiry ends." *Forster*, 426 Md. at 580. *Accord Montgomery County v. FOP*, 427 Md. 561, 572 (2012) ("'If the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and

express a plain meaning, we will give effect to the statute as it is written.'") (quoting *Dep't of Human Res. v. Hayward*, 426 Md. 638, 650 (2012)).

Although we will neither "add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute, and we do not construe a statute with 'forced or subtle interpretations' that limit or extend its application," we "do not read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone." *Mummert v. Alizadeh*, 435 Md. 207, 213 (2013). "Rather, the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute." *Id.* "We presume that the Legislature intends its enactments to operate together as a consistent and harmonious body of law, and, thus, we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope." *Id.*

If the language of the statute is ambiguous, the "'courts consider not only the literal or usual meaning of the words, but their meaning and effect in light of the setting, the objectives and purpose of [the] enactment [under consideration].'" *Stoddard v. State*, 395 Md. 653, 662 (2006) (quoting *FOP v. Mehrling*, 343 Md. 155, 174 (1996)). An ambiguity exists when there are "two or more reasonable alternative interpretations of the statute." *Chow v. State*, 393 Md. 431, 444 (2006) (citation and quotation omitted). In that event, an appellate court will resolve the ambiguity by looking to the statute's legislative history, case

law, and statutory purpose, avoiding a construction of the statute that is "'unreasonable, illogical, or inconsistent with common sense.'" *Stoddard*, 395 Md. at 662-63 (quoting *Blake v. State*, 395 Md. 213, 224 (2006)).

With that background in mind, we look to the statute at issue here. CL § 16-202 provides, in pertinent part, as follows:

> (c) *Motor vehicle lien.* — (1) Any person who, with the consent of the owner, has custody of a motor vehicle and who, at the request of the owner, provides a service to or materials for the motor vehicle, has a lien on the motor vehicle for any charge incurred for any:
> (i) Repair or rebuilding;
> (ii) Storage; or
> (iii) Tires or other parts or accessories.
> (2) A lien is created under this subsection when any charges set out under paragraph (1) of this subsection giving rise to the lien are incurred.

Appellants acknowledge that the plain language of the statute does not include processing fees as part of the lien on the motor vehicle. They argue, however, that a review of the statutory scheme as a whole shows that an "illogical result" would occur "[i]f processing fees are not included into the amount necessary to redeem the vehicle."

Mr. Stansbury argues that "a plain reading of the statute prohibits front-loading the $1000 'cost of process' and making it part of the lien." He asserts that the statutory scheme as a whole provides that "costs of process" be recovered from the proceeds of sale, not made part of the lien itself. He further argues that, even if processing costs could be deemed part

-11-

of the lien, the costs charged here were improper because they were not actual costs incurred by Russel.[4]

The plain language of CL § 16-202 is clear and unambiguous. A person who provides a service to, or materials for, a vehicle has a "motor vehicle lien" only for those charges incurred for repair or rebuilding, storage, or tires or other parts or accessories. A processing fee is not included as a part of the lien.

A review of the statutory scheme as a whole does not, as appellants argue, suggest a different conclusion. Although processing fees may be recovered if the vehicle is sold or if judicial proceedings are instituted, the statutory scheme does not suggest that processing fees constitute a part of the lien that may be included as a part of the amount the consumer must pay to redeem the vehicle.

Appellants point to CL § 16-206, which provides:

**Proceedings if charge disputed.**

(a) *Institution of judicial proceedings*. — (1) If the owner of property subject to a lien disputes any part of the charge for which the lien is claimed, he many institute appropriate judicial proceedings.

---

[4] Civil Justice, Inc., the Maryland Consumer Rights Coalition, and the Public Justice Center filed an amicus curiae brief in this Court in support of Mr. Stansbury. They agree with Mr. Stansbury that the plain language of the garageman's lien statute does not allow "arbitrary processing fees to be part of the lien," and any expenses of a lien sale can only be recovered after the sale. They assert that allowing an arbitrary processing fee to be added to the amount a consumer must pay to redeem the vehicle "not only creates an unfair penalty for consumers like Mr. Stansbury, it also creates a very difficult barrier for consumers to redeem their motor vehicles."

(2) Institution of the proceedings stays execution under the lien until a final judicial determination of the dispute.

(b) *Immediate repossession of property; bond.* — (1) If the owner of property subject to a lien disputes any part of the charge for which the lien is claimed, he immediately may repossess his property by filing a corporate bond for double the amount of the charge claimed.

(2) The bond shall be filed with and is subject to the approval of the clerk of the court of the county where the services or materials for which the lien is claimed were provided.

(3) The bond shall be conditioned on:

(i) Full payment of the final judgment of the claim, together with interest;

(ii) All costs incident to the bringing of the suit; and

(iii) All cost and expenses which result from the enforcement of the lien and are incurred before the lienor was notified that the bond was filed.

(4) Filing of the bond stays execution under the lien until final judicial determination of the dispute.

Pursuant to this statute, Mr. Stansbury could have filed suit disputing the propriety of including the $1,000 processing fee as part of the lien. If Mr. Stansbury had sought repossession of the vehicle, he would have been required to post a corporate bond, conditioned on full payment of "[a]ll costs and expenses which result from the enforcement of the lien." Mr. Stansbury, however, did not choose to pursue these remedies, and there is no argument that he was required to do so. The availability of his option to file suit, and appellant's right to recover costs if he chose to do so, does not support appellant's argument that processing fees are part of the lien that must be paid to redeem the vehicle.

Appellants next point to CL § 16-207, which provides, in pertinent part, as follows:

**Unpaid account settled by public sale; applicability of notice requirements.**

(a) *Sale of property.* — If the charges which give rise to a lien are due and unpaid for 30 days and the lienor is in possession of the property subject to the

lien, the lienor may sell the property to which the lien attaches at public sale. The sale shall be in a location convenient and accessible to the public and shall be held between the hours of 10 a.m. and 6 p.m.

\* \* \*

(e) *Application of proceeds generally.* — (1) If the notice required under § 16-203(b) of this subtitle was sent,[5] the proceeds of a sale under this section shall be applied, in the following order, to:

(i) The expenses of giving notice and holding the sale, including reasonable attorney's fees;

(ii) Subject to subsection (f) of this section, storage fees of the third party holder;

(iii) The amount of the lien claimed exclusive of any storage fees except as provided in subsection (f)(2) of this section;

(iv) A purchase money security interest; and

(v) Any remaining secured parties of record who shall divide the remaining balance equally if there are insufficient funds to completely satisfy their respective interests, but not to exceed the amount of a security interest.

\* \* \*

(4) After application of the proceeds in accordance with paragraph (1) . . . of this subsection, any remaining balance shall be paid to the owner of the property.

We agree with appellants that this statute allows costs of process to be recovered after a vehicle is sold. It does not, however, support their argument that costs of process are part of the lien required to be paid to redeem the vehicle prior to sale.[6]

---

[5] Md. Code (2013) § 16-207(e)(3) of the Commercial Law Article ("CL"), addresses the application of proceeds where the required notice was not sent with respect to a motor vehicle lien. In essence, the lienor may not include any storage charges incurred or imposed in the lien in the event notice was not sent. There is no allegation that the required notice was not sent in this case.

[6] Appellants also cite CL § 16-208, which provides that the owner of property can institute an action of replevin. Mr. Stansbury did not file a replevin action, and this statute

(continued...)

-14-

Based on our review of Title 16 of the Consumer Law Article, and the plain language of CL § 16-202(c), we hold that a motor vehicle lien is based solely on charges incurred for repair or rebuilding, storage, or tires or other parts or accessories. The lien does not encompass "cost of process" fees, and such fees should not be included in the amount the customer must pay to redeem the vehicle.

**II.**

**Violation of the Debt Collection Act**

Having determined that the inclusion of the "processing fees" in the lien amount was improper, the next issue presented by appellants is whether its action in doing so violated the MCDCA, which provides that a debt collector may not "[c]laim, attempt, or threaten to enforce a right with knowledge that the right does not exist." Appellants argue that it did not, as a matter of law, because they had an "absolute legal right to execute upon the lien and sell the vehicle because of the garageman's lien on the vehicle, even if a portion of the lien amount [was] disputed." In any event, they assert that the MCDCA addresses the method of debt collection, as opposed to a challenge to the amount of the underlying debt.

Mr. Stansbury argues that the trial court properly allowed the issue to go to the jury. He asserts that he is not challenging the amount of the underlying debt, but rather, "the method of front loading the $1,000, making it part of the lien amount," and refusing "to

_____

[6](...continued)
has no bearing on the issue presented in this case.

release the vehicle unless he paid the illegal front-loaded fee.  Moreover, he asserts, the verdict sheet in this case did not specify on what factual basis the jury found violations of the MCDCA and MCPA, and there was ample evidence, aside from the impermissible front-loading of fees, to support violations of both Acts.[7]

CL § 14-202 provides that a collector, in collecting or attempting to collect a debt, may not "[c]laim, attempt, or threaten to enforce a right with knowledge that the right does not exist."  Although appellants are correct that they had the right to enforce the garageman's lien, as we have already explained, the plain language of the statute makes clear that "costs of process" are not a part of the lien amount.  In requiring Mr. Stansbury to pay the $1,000 "costs of process" to redeem his vehicle, appellants were attempting to enforce a right that did not exist.

Appellants argue, however, that a challenge to the amount of the underlying debt claimed, such as Mr. Stansbury's dispute regarding the $1,000 processing fee, does not violate the MCDCA.  In support, they cite *Fontell v. Hassett*, 870 F.Supp.2d 395 (D. Md. 2012).  In that case, where a homeowner challenged the validity of an underlying homeowner's association debt, the court found that there was no liability under the MCDCA.  *Id.* at 406.  The court state that the MCDCA "is meant to proscribe certain

---

[7] The amicus brief asserts that charging an upfront processing fee when the statute does not permit this fee is a violation of MCDCA § 14-202(8), which provides that a collector may not "[c]laim, attempt, or threaten to enforce a right with knowledge that the right does not exist."

*methods* of debt collection and is not a mechanism for attacking the validity of the debt itself." *Id.* at 405. It "focuses on the conduct of the debt collector in attempting to collect on the debt, whether or not the debt itself is valid." *Id.*

*Fontell* is not helpful to appellants. As Mr. Stansbury acknowledges, he never disputed that he owed the underlying debt. Rather, his challenge is to the method of collecting the debt, i.e., front-loading processing fees and including those fees as part of the lien.

Because appellants did not have a right to include processing fees in the lien, the jury could properly find that appellants violated the MCDCA by including those costs in the amount of the lien that Mr. Stansbury was required to pay to redeem the vehicle. Accordingly, the jury properly found the appellants were liable for a violation of the MCDCA, as well as the MCPA. *See* CL 13-301 (a violation of the MCDCA constitutes unfair or deceptive trade practices in violation of the MCPA).

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**